FILED
01/14/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2021

## IN RE RILEY S.[1]

**Appeal from the Juvenile Court for Montgomery County**
**No. 19-JV-288          Tim Barnes, Judge**

_____

### Nos. M2020-01602-COA-R3-PT(c); M2021-00018-COA-R3-PT(c)

_____

This appeal concerns the termination of a mother and father's parental rights to their son, Riley S. The trial court found that DCS established several grounds for terminating both parents' parental rights and that termination of their rights was in Riley's best interest. On appeal, neither parent challenges any of the grounds for termination; instead, they contend DCS failed to prove, and that the trial court made insufficient findings to establish, that termination of their parental rights was in Riley's best interest. Following a careful review of the record, we have determined that DCS proved several grounds for termination as to each parent. We have also determined that DCS proved, and the trial court made sufficient findings to establish, that termination of their parental rights was in the best interest of Riley. Accordingly, we affirm the trial court's termination of the mother and father's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and ARNOLD B. GOLDIN, JJ., joined.

Gregory Smith, Clarksville, Tennessee, for the appellant, Letta D.

B. Nathan Hunt, Clarksville, Tennessee, for the appellant, Clint S.

Herbert H. Slatery III, Attorney General and Lexi A. Ward, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Elizabeth Pugh, guardian ad litem, Clarksville, Tennessee, for the appellee, Riley S.

---

[1] This court has a policy of protecting the identity of children by initializing the last names of the parents and child.

# OPINION

## FACTS AND PROCEDURAL HISTORY

Riley S. was born in May of 2017 to Letta D. ("Mother") and Clint S. ("Father"). At the time of his birth, Riley was found to be drug exposed. On July 20, 2017, when Riley was two months old, the Tennessee Department of Children's Services ("DCS") received a report alleging, *inter alia*, substance abuse issues and lack of suitable housing. A few days later, a DCS investigator, along with local police, contacted Mother at a motel where she and Riley were staying. When the officers grew concerned of drug abuse, they drug tested Mother with her consent. Mother tested positive for Buprenorphine, Opiates, and Oxycodone. Though Mother indicated that she had taken prescribed medication a few hours before, she could not provide officers with any prescription bottles and could not explain her inability to do so. After noticing that Mother had four active warrants for her arrest, the officers arrested Mother and placed Riley with a safety placement. Shortly thereafter, Mother and Father entered into an Immediate Protection Agreement ("the IPA") which prohibited Mother or Father from having unsupervised visitation with Riley and required that Riley continue to reside with his safety placement. On July 31, 2017, DCS filed a dependency and neglect petition alleging substance abuse issues; lack of appropriate supervision; and lack of stability, income, and housing.

On August 7, 2017, Mother violated the IPA when she removed Riley from his safety placement and did not return him. Riley was located and taken into DCS custody on August 8, 2017. That same day, DCS held a meeting with Mother to discuss the reasons for Riley's removal and the permanency plan process. Father was not present at this meeting and Mother stated that she was unsure of Father's whereabouts. It was later determined that Father was incarcerated. On August 9, 2017, DCS filed a petition for removal, which the trial court granted. After a hearing on November 7, 2017, regarding the initial dependency and neglect petition, the court found Riley dependent and neglected. Soon after, Riley exited DCS custody and was placed on a trial home visit with his maternal grandmother ("Grandmother").

On April 4, 2018, while Riley was living with Grandmother, DCS filed a second dependency and neglect petition alleging lack of supervision and drug exposure by both Grandmother and Mother. As a result, Riley reentered DCS custody on April 14, 2018. At a subsequent hearing, both Mother and Grandmother testified that Mother exercised unsupervised contact with Riley while Riley resided with Grandmother. On July 11, 2018, the court found Riley dependent and neglected for a second time after Mother waived her right to a hearing. Consequently, Riley remained in DCS custody and was placed with a foster family.

## I. PERMANENCY PLANS

From September 2017 to November 2018, Ellen Spivey, a DCS social worker, created three separate permanency plans pertaining to both Mother and Father.[2] All three plans required both Mother and Father to: (1) have a legal source of income and provide proof to DCS; (2) notify DCS when adequate housing was obtained and provide proof of rent and utilities; (3) allow DCS to conduct a walkthrough of the family home; (4) fully care for the child at visitations; and (5) to attend visitation. Additionally, all three plans required Mother to: (1) complete a parenting assessment and follow all recommendations; (2) demonstrate the ability to parent effectively during visitation; (3) provide Riley with basic needs; (4) attend all doctor and dental visits with Riley; (5) take all medications as prescribed and be free from illegal substances; (6) demonstrate and maintain a sober lifestyle; (7) participate in a non-self-reporting alcohol and drug assessment and follow all recommendations; (8) attend outpatient substance abuse treatment; (9) comply with random drug screens; and (10) provide prescriptions in original containers and submit to random pill counts.

In an effort to assist Mother and Father in fulfilling the requirements of each permanency plan, DCS provided Mother and Father with a resource guide listing supports and services in the community, offered to assist Mother with securing appropriate housing, spoke with doctors and staff at Mother's rehabilitation facility, provided Mother with pill counts and drug screens, assisted Mother with her substance abuse issues, and assisted Father with his substance abuse issues prior to his incarceration. Mother and Father failed to complete nearly every task outlined in the permanency plans.

Mother never provided DCS with any proof of employment or income. At the time of trial, Mother indicated that she had been employed at various locations, but Mother was never able to provide any proof of such employment. Though Mother contends that she would provide Riley's foster family with diapers, Mother failed to pay any monetary child support. Moreover, throughout the entire case, Mother never provided proof that she had suitable housing and continually failed to provide DCS with an address for any residence. Though Mother claimed to live in her aunt's home and, later, her adult daughter's home, Mother admitted that she was not on lease at either location and that she never reported either address to DCS. At trial, Mother asserted that she had also lived with Grandmother. According to Ms. Spivey, however, none of Mother's possessions existed in Grandmother's home at the time of Riley's trial placement in November 2017. Moreover, Mother never permitted DCS to conduct a walkthrough of any residence.

---

[2] The first permanency plan, created on September 18, 2017, is not included as an exhibit in the record on appeal, and it is unclear whether it was ever ratified by the court. Both subsequent permanency plans, however, are included as exhibits on appeal, and were ratified on June 19, 2018, and November 13, 2018, respectively.

Furthermore, Mother continually failed to adhere to the terms of her visitation with Riley. While Mother initially had supervised visitation with Riley, in-person visitation ceased in December 2019 due to Mother's continued substance abuse and Mother's testing positive for substances prior to visits. After December 2019, Mother only saw Riley at court proceedings or via FaceTime. At the time of trial, Riley only recognized Mother as "Ms. Letta."

Mother continuously demonstrated significant substance abuse issues by regularly testing positive for various drugs, including oxymorphone and buprenorphine, throughout the entirety of the DCS case. Significantly, Mother tested positive for oxycodone as recently as September 1, 2020, less than two months before trial. Although Mother contended that she took prescribed medication, she never effectively demonstrated to DCS that she had valid prescriptions. When Mother would provide pill bottles to DCS, the bottles were empty and were as many as four months behind the prescription date. Though Mother was able to provide prescription bottles, she was never able to provide a valid doctor's prescription. For this reason, DCS was never able to determine whether Mother's prescriptions were current or valid, or whether Mother was complying with the recommended dosage and prescription. Even more, when DCS conducted pill counts, the pills did not add up.

Although Mother chose to attend a rehabilitation program in March 2019 and, later, an intensive outpatient treatment program, Mother failed to complete a non-self-reporting alcohol and drug assessment as required by her permanency plans. Even after completion of the rehabilitation program and the outpatient program, Mother continued to test positive on random drug screens. From December 2019 to trial in October 2020, Mother had only one clean drug screen.

For his part, Father failed to demonstrate a commitment to any of the tasks outlined in his permanency plans. Father, who was incarcerated in September 2017 for violating his probation and remained incarcerated through trial,[3] never visited Riley after his removal, not even before Father's incarceration. Furthermore, Father never provided proof of employment or a source of income and never paid child support. Father also failed to demonstrate that he was working to address his substance abuse issues, and Father did not complete a non-self-reporting drug and alcohol assessment as required by each permanency plan.

---

[3] On September 21, 2017, shortly after creation of the first permanency plan, Father pled guilty to criminal impersonation under Tennessee Code Annotated § 39-16-301, which violated his probation. Father's probation was related to writing a bad check in 2013. He was not scheduled to be released until April 2022.

## II.    TERMINATION PROCEEDINGS

On February 22, 2019, DCS filed a petition to terminate Mother and Father's parental rights to Riley. At this point, Riley had resided with the same foster family since April 2018, and his foster parents wished to adopt him.

The case went to trial on October 20, 2020, during which the court heard testimony from Ellen Spivey, Mother, and Father. The court also admitted into evidence and considered several documents, including the juvenile court file and Father's criminal records. At the conclusion of trial, the court announced it would be granting the petition to terminate both Mother and Father's parental rights.

In its final written order filed on December 18, 2020, the trial court found that DCS established four grounds for termination as to Mother: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plan, (3) persistence of conditions, and (4) failure to manifest a willingness or ability to care for the child. Additionally, the trial court found that DCS established four grounds for termination as to Father: (1) abandonment by wanton disregard, (2) substantial noncompliance with the permanency plan, (3) persistence of conditions, and (4) failure to manifest a willingness or ability to care for the child.[4] The court also found that termination of both Mother and Father's rights was in the best interest of Riley for several reasons, including: Mother and Father's failure to change their conduct or circumstances over a period of three years; Mother and Father's failure to maintain regular visitation; the negative effect that a change in Riley's caretakers would likely have on his emotional, psychological, and/or medical conditions; Father's failure to maintain a meaningful relationship with Riley; Mother and Father's substance abuse; and Mother and Father's failure to pay child support.

This appeal followed.

### ISSUES

Father raises two issues on appeal: (1) whether the trial court erred in terminating Father's parental rights, and (2) whether the trial court conducted a proper best interest analysis addressing all of the statutory best interest factors.

---

[4] Page 10 of DCS' brief asserts that the trial court found it had established two additional grounds for termination of Father's parental rights: "2) abandonment by failure to visit, 3) abandonment by failure to support[.]" Upon review of the trial court's final order, however, we find nothing to indicate that the trial court found that either of these grounds had been proven. We also note that neither ground is discussed in the argument or elsewhere in the brief filed by DCS. Thus, we assume this was a scrivener's error. More importantly, because neither ground was relied upon by the trial court to terminate parental rights of Father, we decline to discuss either ground. *See In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016) (holding that this court should review all grounds relied upon by the trial court to terminate parental rights.).

Mother raises a similar, singular issue on appeal: whether the trial court erred in finding that it was in the best interest of the Children to terminate Mother's parental rights when the record is insufficient, as a matter of law, to support termination.

Although neither parent challenges any of the grounds supporting the termination of their parental rights, we have an affirmative duty to review the trial court's findings as to each ground the trial court found to have been proved. *See In re Carrington H.*, 483 S.W.3d at 525. Accordingly, we will also consider whether each ground the trial court found to have been proved was clearly and convincingly established. *See In re Navada N.*, 498 S.W.3d 579, 590 (Tenn. Ct. App. 2016).

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522.

In an appeal, "this court is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our own "determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.

*See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523–24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## ANALYSIS

### I.    GROUNDS FOR TERMINATION

In its final written order, the trial court found that DCS established four grounds for terminating Mother's parental rights: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plan, (3) persistence of conditions, and (4) failure to manifest a willingness or ability to care for the child. In addition, the trial court found that DCS established four grounds for terminating Father's parental rights: (1) abandonment by wanton disregard, (2) substantial noncompliance with the permanency plan, (3) persistence of conditions, and (4) failure to manifest a willingness or ability to care for the child. We will discuss each ground in turn. Where a single ground was found to apply to both Mother and Father, we will review its application to each parent in turn.

### A.    Abandonment – Failure to Provide a Suitable Home

The trial court found that DCS clearly and convincingly established the ground of abandonment by failure to provide a suitable home as to Mother.

Tennessee Code Annotated § 36-1-102 defines "abandonment," in relevant part as follows:

(1)(A) For purposes of terminating the parental . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

.    .    .

(ii)   The child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child . . . and the child was placed in the custody of the department . . . that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the

- 7 -

department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Thus, in order to rely on this ground, the trial court must find (1) that the child was adjudicated dependent and neglected; (2) that the child was removed from the home; (3) that "for the four [] months following removal," DCS made reasonable efforts to assist the parent in establishing a suitable home for the child; and (4) that, despite such reasonable efforts, the parent failed to secured suitable housing and "has demonstrated a lack of concern for the child to such a degree that it appears unlikely the parent will be able to provide a suitable home for the child at an early date." *See In re Navada N.*, 498 S.W.3d at 595; Tenn. Code Ann. § 36-1-102(1)(A)(ii). Efforts will be considered reasonable if the efforts of DCS "exceeded the efforts of the parent or guardian toward the same goal. . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In its final order, the trial court found that Riley had been adjudicated dependent and neglected and removed him from Mother's legal custody on August 8, 2017. Moreover, the trial court determined that DCS made reasonable efforts to assist Mother in locating suitable housing, but that Mother:

Ha[d] not made even minimal efforts to improve her home and personal condition. . . [and that] [h]er lack of concern for the child is to such a degree that it appears unlikely she will be able to provide a suitable home . . . at an early date. [Ms. Spivey] testified that the mother continued to have substance abuse issues, she lacked stable housing[,] and lived a chaotic lifestyle. Her home was neither safe nor appropriate for the child.

.     .     .

. . . [A]t no point during the relevant four-month period, at no point during the three-year combined custodial episodes, did the mother ever provide an address of a suitable residence so DCS could come out and say, [w]e have looked at the residence . . . and it's suitable.

. . . On the basis of the foregoing facts, the Court concludes that [Mother] has abandoned the child pursuant to Tenn. Code Ann. §[]36-1-113(g)(1), as such term is defined in Tenn. Code Ann. § 36-1-102(1)(A)(ii).

As a threshold matter, it is undisputed that Riley was adjudicated dependent and neglected by the court on August 8, 2017, and removed from Mother's care. Furthermore, the record clearly supports the trial court's finding that DCS put forth reasonable efforts to assist Mother in finding suitable housing. In this regard Ms. Spivey testified, without contradiction by Mother, that she provided Mother with various methods of contacting DCS for assistance, provided both parents with a resource guide listing supports and services in the community, and offered to assist Mother with securing appropriate housing.

Nevertheless, even with the assistance of DCS, Mother failed to secure suitable housing during the four-month period proceeding Riley's removal or at any time throughout the DCS case.[5] Mother testified that she lived with an aunt, her adult daughter, and Grandmother following Riley's initial removal, but Mother failed to provide DCS with the address of any residence. For this reason, DCS was never able to conduct a walkthrough of any residence to determine if Mother had, in fact, located a suitable home. Though DCS conducted a walkthrough of Grandmother's home for the purpose of placing Riley on a trial home visit, Ms. Spivey testified that at the time of the walkthrough, there was no indication that Mother was living in the home.[6] Accordingly, Mother failed to establish that she had a suitable physical location for Riley to reside.

Furthermore, "[a] 'suitable home requires more than a proper physical living location.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). "It requires that the home be free of drugs. . . ." *Id*. As the trial court found, the record demonstrates that Mother continually struggled with drug abuse. Specifically, Mother failed nearly every drug screen, tested positive for oxycodone just a few weeks before trial began in October 2020, failed to provide proof of a valid prescription for any medication, and failed to provide pill counts showing that Mother was taking medication in accordance with the recommended dosage. *See In re Dillon E.*, No. M2016-00880-COA-R3-PT, 2016 WL 6778186, at *14 (Tenn. Ct. App. Nov. 15, 2016) ("[m]other's home could not be deemed suitable so long as she refused to cooperate fully regarding her abuse of prescription drugs.").

---

[5] For purposes of this analysis, the relevant four-month period began when Riley was first removed from Mother's care on August 8, 2017, and, accordingly, ended on December 8, 2017. We note, however, that at trial, Ms. Spivey testified that Mother had been unable to provide proof of suitable housing throughout the entirety of the DCS case.

[6] Significantly, if Mother was, in fact, living with Grandmother at the time of trial, DCS asserts that Grandmother's home could not constitute a suitable home for Riley as his presence in the home would violate a court order pertaining to the second dependency and neglect petition filed on April 4, 2018.

For the foregoing reasons, DCS proved by clear and convincing evidence that Mother failed to provide a suitable home. Accordingly, we affirm the trial court on this ground.

## B. Substantial Noncompliance with the Permanency Plan

The trial court found that DCS clearly and convincingly established the ground of substantial noncompliance with the permanency plan as to both Mother and Father.

A parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Noncompliance with the permanency plan may be grounds for termination only "if the court finds the parent was informed of [the plan's] contents, and that the requirements . . . [were] reasonable and [were] related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C); *see also In re Valentine*, 79 S.W.3d at 547. "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. Whether a parent's noncompliance is substantial depends on "the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted).

Mother entered into three permanency plans. Each plan required Mother to: (1) have a legal source of income and provide proof to DCS; (2) notify DCS when adequate housing was obtained and provide proof of rent and utilities; (3) allow DCS to conduct a walkthrough of the family home; (4) fully care for child at visitations; (5) attend visitation; (6) complete a parenting assessment; (7) demonstrate the ability to parent effectively during visitation; (8) provide the child with basic needs; (9) attend all doctor and dental visits with Riley; (10) take all medications as prescribed and be free from illegal substances; (11) demonstrate and maintain a sober lifestyle; (12) participate in a non-self-reporting alcohol and drug assessment and follow all recommendations; (13) attend outpatient substance abuse treatment; (14) comply with random drug screens; and (15) provide prescriptions in original containers and submit to random pill counts.

In its final order, the trial court found that Mother participated in the development of each permanency plan and was aware that failure to substantially comply with the requirements of the permanency plans was a ground for termination. Moreover, the court found that each task set out in each permanency plan was "reasonable and related to remedying the issues which led to the child's removal from the home such that, had [Mother] cooperated with the same, it would have addressed the issues for which the child was in foster care." While the trial court acknowledged that Mother had complied with some aspects of the parenting plan, such as completing a non-self-reporting alcohol and drug assessment, it also noted that Mother otherwise "failed to complete even the most

basic of tasks set out . . . in the permanency plans." The trial court also addressed her failure to fulfill the most important tasks outlined in each plan including Mother's failure to obtain and provide proof of suitable housing, Mother's failure to maintain a sober lifestyle, and Mother's failure to pass random drug screens. Based on these and other facts, the court concluded that Mother failed to substantially comply with the permanency plan.

At trial, Ms. Spivey testified that Mother failed to complete almost every task outlined in each permanency plan, including the task Ms. Spivey believed to be of the utmost importance to reunification with Riley—remedying her substance abuse and ceasing use of illegal drugs. She further stated that Mother did attend in-person visitation with Riley; however, in December 2019, the court limited Mother's visitation to FaceTime due to Mother's continued failure to pass drug screens.[7] Mother completed a non-self-reporting alcohol and drug assessment; however, she failed to follow the recommendations of the assessment. Further, although Mother attended a rehabilitation program and, later, an outpatient substance abuse treatment, she continued testing positive for illicit substances after completing the rehabilitation program and during her outpatient substance abuse treatment. Ms. Spivey also testified that Mother consistently failed to provide valid prescriptions or successful pill counts and was seldom able to provide prescription pill bottles containing any pills. Ms. Spivey further stated that Mother was only able to present a pill bottle containing pills once and, even so, the bottle contained pills other than those prescribed according to the bottle's label.

The record before us supports the trial court's determination that Mother participated in the development of each permanency plan, and she was aware of her responsibilities under each plan. The record also supports the court's finding that each task of the permanency plans was reasonable and related to the conditions that necessitated foster care. It also clearly and convincingly supports the trial court's determination that Mother disregarded nearly every requirement necessary to a successful reunification with Riley as evidenced by the trial testimony.

For the foregoing reasons we affirm the trial court's conclusion that DCS proved by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans.

On appeal, DCS concedes that the record lacks sufficient evidence to support the trial court's finding of substantial noncompliance with the permanency plans as to Father. We agree.

---

[7] While we note that, during a period of time in 2020, COVID-19 may have prevented Mother from having in-person contact with Riley regardless of Mother's inability to pass the random drug screens, Mother had been denied in-person visitation based on her drug use for several months leading up to Montgomery County's decision to cease in-person visitation, and she continued to test positive for illicit substances throughout the entire DCS case.

DCS created three permanency plans with each plan pertaining to both Mother and Father. Each plan required Father to: (1) make voluntary child supports payments; (2) maintain consistent visitation with Riley; (3) obtain a legal source of income and provide proof to DCS; (4) notify DCS when adequate housing was obtained and provide proof of rent and utilities; (5) allow DCS to conduct a walkthrough of the family home; (6) complete a non-self-reporting alcohol and drug assessment and comply with all recommendations; and (7) fully care for the child at visitations.

The trial court found that Father had not substantially complied with the permanency plans because (1) Father was in jail for "all of the four months just before this petition was filed for Violation of Probation[;]" (2) Father failed to visit Riley in the four months before he went to jail, though he was able to visit; (3) Father engaged in a "broad pattern" of illegal behavior; and (4) Father "abuses illegal drugs and has unaddressed substance abuse issues." However, the trial court did not make a factual finding regarding whether Father was informed of each plan and its contents. *See* Tenn. Code Ann. § 37-2-403(a)(2)(C); *see also In re Valentine*, 79 S.W.3d at 547 (explaining that a parent cannot be found to have failed to substantially comply with a permanency plan unless the court finds that the parent was informed of its contents).

Ms. Spivey testified that Father was not present at the initial meeting in which Mother and Ms. Spivey developed the first permanency plan. Though Ms. Spivey indicated that she mailed a copy of each permanency plan to Father's correctional facility, Ms. Spivey did not testify as to whether Father actually understood what the plans required of him or the consequences of noncompliance. Moreover, because a copy of the initial permanency plan is not contained in the record on appeal, the record is devoid of any indication that Father acknowledged its terms in writing.

Similarly, Father testified that he was not aware of his responsibilities under either of the subsequent permanency plans, created while Father was incarcerated. While Father testified that he recalled a visit with Ms. Spivey while he was incarcerated, Father stated that he only recalled Ms. Spivey handing him "a stack of papers" and asking him to willingly terminate his rights. Moreover, though not determinative on its own, we find it significant that neither subsequent permanency plan, as contained in the record on appeal, contains Father's signature or any acknowledgment of agreement from Father.

Because the record fails to establish that Father was aware of or acknowledged the contents of each permanency plan, we reverse the trial court on this ground and hold that DCS did not establish that Father failed to substantially compliance with the permanency plans.

### C. Failure to Manifest an Ability or Willingness to Assume Custody

The trial court found that DCS established the ground of failure to manifest an ability or willingness to assume custody as to both Mother and Father.

A court may terminate a parent's rights if the parent (1) "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child;" and (2) "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

In construing this statute, the Tennessee Supreme Court has "held that the first prong requires clear and convincing proof that the parent 'has failed to manifest <u>either</u> ability or willingness' to assume custody of or responsibility for the child." *In re Manning H.*, No. M2020-00663-COA-R3-PT, 2021 WL 2935047, at *6 (Tenn. Ct. App. July 13, 2021) (quoting *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). In order to satisfy the second prong, DCS must show "clear and convincing proof that placing the child in the parent's physical custody would likely cause substantial harm." *In re Manning H.*, 2021 WL 2935047, at *6. Though the statute does not specifically define "substantial harm," this court has construed it to require showing "a real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

In its final order, the court specifically found that, though Mother testified she had some form of employment, Mother had not paid any meaningful monetary support over the course of Riley's custodial episode and had never provided any proof of employment to DCS. Furthermore, the trial court noted that Mother had continually purchased oxycodone using cash, though Mother failed to provide financial child support for Riley.

Moreover, the court found Mother's lack of effort in overcoming her substance abuse issues and maintaining a sober lifestyle demonstrated an inability and unwillingness to assume financial responsibility over Riley. It additionally found that her failure to provide DCS with any address or leasing information illustrated Mother's inability and unwillingness to assume physical custody of Riley.

Similarly, the trial court found that over the course of these proceedings Father was "primarily incarcerated," and that "even when he was out, he did not provide any financial support." In addition, the trial court determined that Father failed to complete any task showing that he was willing or able to take physical custody of Riley.

Accordingly, the trial court concluded that placing Riley in Mother or Father's custody would post a substantial risk of harm to him "due to neither parent remedying the reasons why the child was placed in foster care."

Based on these and other facts in the record, the trial court found that "[Mother] and [Father] have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child."

For these reasons, and after careful review of the record, we affirm the trial court's determination that DCS proved by clear and convincing evidence that both Mother and Father failed to manifest an ability or willingness to assume custody of Riley, and that placing Riley in their custody would likely cause substantial harm under Tennessee Code Annotated § 36-1-113(g)(14).

## D. Abandonment – Wanton Disregard

The trial court found that DCS established the ground of abandonment by wanton disregard as to Father.

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated § 36-1-102(1)(A). As is relevant to this appeal, Tennessee Code Annotated § 36-1-102(1)(A)(iv) defines abandonment as follows:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or *a parent . . . has been incarcerated during . . . part of the four (4) consecutive months immediately preceding the filing of the action* and []:
>
> .    .    .
>
> (c) *Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . .*

(Emphasis added).

"Wanton disregard" is not a defined term, but this court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005) (citations omitted).

Tennessee Code Annotated § 36-1-102(1)(A)(iv) represents the General Assembly's "commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *Id*. at 866. "The actions that our courts have commonly found to constitute wanton

disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Incarceration alone does not satisfy the test for abandonment by wanton disregard. *In re Audrey S.*, 182 S.W.3d at 866. Instead, the court must find "by clear and convincing evidence that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id*. A "parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id*.

In its final order, the trial court found that Father was in jail during the four months prior to DCS filing the petition in February 2019 and was not due to be released from jail until sometime after the conclusion of the trial. The court went on to recognize that in the months before Father was incarcerated, Father failed to visit Riley and could "provide no justifiable reason for not visiting." Furthermore, the court found it significant that Father was arrested soon after Riley first came into DCS custody on August 8, 2017. For these reasons, the trial court determined:

> [Father] conduct[ed] himself in such a way that approximately a month to six weeks after the child goes into custody; he is arrested, locked up again[] for criminal impersonation. In the relevant time period, he is in jail for at least ten day[s] during a time when his child is in custody of [DCS] and prior to this petition being filed.

> The proof before the Court is that at no time during the three-year period was the father ever able – either able or willing to provide any kind of financial support for the minor child. The Court would find that that kind of conduct and that kind of behavior establishes the ground of wanton disregard . . . .

Ultimately, the trial court concluded that clear and convincing evidence of wanton disregard existed to terminate Father's parental rights. We have determined that the record supports this conclusion.

Father was arrested shortly after Riley was taken into DCS custody in August 2017, for a violation of his probation. Father was arrested and sentenced to six years of probation in 2013, approximately four years before Riley's birth. While we recognize that Father's first arrest occurred years before Riley's conception, the fact that Father was on probation at the time Riley was taken into DCS custody demonstrates that Father was aware of the potential consequences of any future criminal conduct, up to and including incarceration, but nevertheless he chose to engage in criminal activity during the relevant four month

period.[8] Furthermore, trial testimony established that Father did not make any effort to visit with Riley, and continued to demonstrate substance abuse, in the time between Riley's removal and Father's incarceration. Finally, Father continually failed to make any effort to support Riley after his removal.

Based on a thorough review of the record, we affirm the trial court's ruling that the ground of abandonment by wanton disregard was established by clear and convincing evidence as to Father.

## E. Persistence of Conditions

The trial court found that DCS established the ground of persistence of conditions as to both Mother and Father. Under Tennessee Code Annotated § 36-1-113(g)(3), parental rights may be terminated when the child has been removed from the parent's custody for six months as a result of an adjudication of dependency and neglect and three factors exist:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii)   The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home . . . .[9]

The purpose of this ground is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). As the statute prescribes, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, 2008 WL 4613576, at *20). Further, "[w]here . . . efforts

---

[8] For purposes of this analysis, the relevant four-month period prior to Father's incarceration began on May 21, 2017 and ended on September 21, 2017.

[9] Tennessee Code Annotated § 36-1-113(g)(3) requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

As the trial court found, it is undisputed that Riley has been removed from Mother and Father's care and legal custody for more than six months. Furthermore, the trial court found that, despite DCS's efforts, the conditions which led to Riley's removal still existed. In making its determination, the trial court found that "both parents had exactly the same problems they had at the beginning of the custodial episode in August of 2017." Specifically, the court found that both Mother and Father failed to address substance abuse issues, lacked stability in their lives, lacked suitable housing, and lacked sufficient income to care for Riley. Additionally, the court highlighted Father's incarceration at the time of trial, his continued criminal history, and Father and Riley's lack of relationship. The court went on to recognize that, based on "the history of [the] case and the time that has passed, . . . there is little chance that those conditions will be remedied soon so that the child can return home." Finally, the trial court found that continuing Riley's relationship with Mother and Father would greatly diminish Riley's chance of "integrating into a safe, stable[,] and permanent home."

Furthermore, as the trial court found and we have confirmed, Riley was adjudicated dependent and neglected and was removed from his parents' custody for at least six months. Both Mother and Father failed to remedy the conditions which lead to Riley's removal including substance abuse, lack of stability, lack of income, and lack of appropriate housing.

As previously discussed, in the three years between Riley's initial removal and trial, Mother failed to effectively address her substance abuse issues. She did not secure suitable housing and did not provide DCS with any proof of address, lease, or utilities. Ms. Spivey testified that Mother never contacted DCS to conduct a walkthrough of any residence. Further, Mother's continued use of illicit substances made it such that any residence of Mother's would not have been a suitable home for Riley. She never provided proof of employment or income although Mother testified that she had some employment during the three-year custodial episode and that she recently began work at an inn. Mother continued to demonstrate instability. As Ms. Spivey testified, Mother continued to live a "chaotic" lifestyle.

Similarly, Father failed to demonstrate that he effectively worked to improve the conditions which lead to Riley's removal. Significantly, and as discussed earlier, at the time the petition was filed and at the time of trial, Father was incarcerated and was not due to be released until an uncertain date after the trial concluded. Furthermore, Ms. Spivey testified that, prior to Father's incarceration, he had not taken steps to address the conditions which led to Riley's removal, namely his substance abuse and instability. Moreover, Father's continued instability was made evident by his criminal record and lack of any relationship with Riley.

Riley had been living with the same foster family since April 2018, and Riley had bonded with his foster parents as well as the other child in the home. Riley called his foster parents "Mom" and "Dad", while recognizing Mother as "Ms. Letta." Ms. Spivey stated that Riley had been diagnosed with autism, but was provided daycare at a special education school to address his diagnosis, and that Riley's foster parents kept him up to date on his medical and dental needs.

Based on the foregoing and other evidence, the trial court ruled that DCS had proven by clear and convincing evidence the ground of persistence of conditions as it pertains to both Mother and Father, and we affirm the ruling.

Having determined that DCS proved several grounds for termination as to both Mother and Father, we next consider whether termination of the parental rights of Mother and Father was in Riley's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *see also In re Valentine*, 79 S.W.3d at 546.

## II.    BEST INTEREST ANALYSIS

Mother and Father contend the trial court erred by finding that it was in Riley's best interest for their parental rights to be terminated.

For her part, Mother asserts that she and Riley enjoy "an active interacting relationship," that she and Riley have bonded, that Mother helped to care for Riley by providing his foster parents with diapers, that Mother has a job, that Mother has suitable housing, and that Mother is addressing her substance abuse issues. Similarly, Father contends that he made efforts to resolve his legal issues and served his sentence "as expediently as possible, so he could see his child." Furthermore, Father contends that he is no longer incarcerated, has "no pending criminal matters," and has "no drug or alcohol problem." Moreover, both parents assert that the trial court's analysis, as contained in its final written order, was incomplete and did not sufficiently identify facts to support its conclusions. We shall address each challenge in turn.

Tennessee Code Annotated § 36-1-113(i) identifies factors to be considered when analyzing whether termination of parental rights is in a child's best interest; however, these "factors are illustrative, not exclusive," and the parties are free to offer proof of any other relevant factor to the analysis.[10] *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In

---

[10] The petition at issue was filed prior to April 22, 2021, at which time Tennessee Code Annotated § 36-1-113(i) identified nine factors for consideration. The statute was subsequently amended and it now includes additional factors that should be considered, if relevant. *See* 2021 Pub. Acts, c. 190, § 1, eff. Apr. 22, 2021. Because the amended statute applies only to petitions for termination filed on or after April 22, 2021, the new factors do not apply to the present case.

*In re Gabriella D.*, the Tennessee Supreme Court summarized the law pertaining to this analysis:

> Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

531 S.W.3d 662, 681–82 (Tenn. 2017).

"The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878 (citations omitted). "When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" Tenn. Code Ann. § 36-1-101(d). The trial court set forth findings of fact regarding the factors it deemed applicable, and we review those findings below.

### 1. Adjustment of Circumstance

The first factor to be considered in determining whether termination is in a child's best interest is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian." Tenn. Code Ann. § 36-1-113(i)(1).

The trial court found that Mother and Father "have not made changes in her conduct or circumstances that would make it safe for the child to go home." Furthermore, the trial court concluded by stating, "DCS has now attempted this reunification this last custodial episode three years – over three years, and that adjustment has not been made." For these

two reasons, the trial court found that this factor weighed in favor of terminating both parents' rights. After review of the record, we have determined that the evidence does not preponderate against these findings.

At trial, the testimony revealed that neither Mother nor Father had custody of Riley for over three years. Significantly, we have affirmed the trial court's finding that Mother had not made any efforts to comply with the three permanency plans created during the custodial episode. Moreover, testimony established that Mother still lacked proper financial resources or suitable housing to care for Riley, and that Mother continued to struggle with substance abuse.

As for Father, he was incarcerated when the petition was filed and at the time of trial. Significantly, the circumstances surrounding Father's incarceration, namely that Father was incarcerated for a violation of his probation, demonstrate that Father only continued to engage in criminal conduct. While in prison, Father never made any attempt to pay child support. Furthermore, Ms. Spivey testified that Father had not taken any steps to effectively address his substance abuse issues, including completion of the non-self-reporting drug and alcohol assessment. Thus, the evidence does not preponderate against the trial court's finding that this factor weighs in favor of termination of parental rights as to both Mother and Father. [11]

### 2. Lasting Adjustment

The second factor to be considered is "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. §36-1-113(i)(2).

The trial court found that both Mother and Father "have not made lasting changes in [their] lifestyle or conduct after reasonable efforts by the state to help, so that lasting

---

[11] On appeal, Father asserts a number of facts for our consideration, all of which pertain to changes in his circumstances since December 2020, when the trial court put down its final order. Father has not, however, filed a Motion to Consider Post-Judgment Facts pursuant to Tenn. R. App. P. 14(a). While this court is permitted by the same rule to consider post-judgment facts on its own motion, we decline to do so. *See* Tenn. R. App. P. 14(c). Tennessee Rule of Appellate Procedure 14(a) dictates that, while not controlling the court's discretion, consideration of post-judgment facts will generally extend "only to those facts, capable of ready demonstration . . . ." For this reason, this court recently held that when facts are not capable of determination absent an evidentiary hearing, consideration of those post-judgment facts are inappropriate. *See In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at \*21 (Tenn. Ct. App. Feb. 26, 2021). Here, apart from Father's being released from prison, consideration of every other fact asserted by Father regarding current living conditions and employment would necessitate a new evidentiary hearing. *See id*. at \*21 (citing Tenn. R. App. P. 14) (finding that facts regarding a change in a parent's living conditions was "not capable of ready determination without an evidentiary hearing . . . ."). Thus, because Father asserts facts that came to be after trial and are not capable of ready demonstration absent a new hearing on the matter, we decline to consider them on appeal.

change does not appear possible." The trial court went on to recognize that "services have been provided, transportation, payment of electricity bills, rent, any number of services, parenting services, pill counts." Nevertheless, the court recognized that it did not reasonably appear that any adjustments had been made by either parent.

As previously discussed, both Mother and Father had not resolved several of the conditions that caused Riley to enter DCS custody in over three years. Specifically, at the time of trial, Mother still had not provided proof of a suitable home and proof of income or employment. Moreover, while Mother did take steps to address her sobriety by entering into a rehabilitation program and, later, an outpatient program, Mother could not, in the three years proceeding Riley's removal, show an ability to maintain a sober lifestyle outside of a facility. Additionally, while Father may have been released from incarceration, this release did not take place until months after the trial court's final order and approximately two years after DCS filed this termination petition. As of trial, Father was still incarcerated, had failed to visit with Riley, and had failed to make any effort to support Riley while in prison.

Accordingly, having determined that the evidence does not preponderate against the trial court's findings, we agree with the trial court that this factor weighs in favor of termination as to both Mother and Father.

### 3. Regular Visitation or Contact

The third factor to be considered is "[w]hether the parent . . . has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3).

The trial court found that both Mother and Father had failed to engage in regular visitation with Riley. We agree that this factor weighs in favor of terminating Father's rights, however we find that the evidence preponderates against the trial court's finding that Mother failed to engage in regular contact with Riley.

As for Mother, we have determined that the evidence preponderates against the trial court's findings. Testimony established that since Riley was first taken into DCS custody on August 8, 2017, Mother's substance abuse prevented her from having regular in-person visitation with Riley; nevertheless, she did maintain regular *contact* with him. According to Ms. Spivey, Mother maintained in-person visitation with Riley until December 2019, when the court conditioned Mother's in-person visitation on her ability to pass a drug screen, and she could not do so. Though in-person visitation ceased in December 2019, testimony established that Mother continued to maintain regular contact with Riley's foster mother, would regularly call Riley, and would FaceTime with Riley at least once per week. Thus, while Mother had not visited with Riley in-person for nearly a year by the time of trial, she did maintain regular contact. For these reasons, we find the evidence preponderates against the trial court's finding that this factor weighs in favor of termination as to Mother.

As for Father, it is undisputed that Father failed to visit with Riley after Riley was taken into DCS custody on August 8, 2017. Thus, the trial court found that he had not engaged in any regular visitation or contact with Riley. For these reasons, the trial court concluded that this factor weighed in favor of terminating his parental rights, and the evidence does not preponderate against these findings.

### 4.  Meaningful Relationship

The fourth factor to be considered is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." Tenn. Code Ann. § 36-1-113(i)(4).

The trial court found that Father had failed to maintain any meaningful relationship with Riley. This finding was based on testimony that demonstrated a total lack of relationship between Riley and Father. Specifically, testimony established that Father had not had any visitation or contact with Riley over the course of nearly three years. For this reason, the court found that this factor weighed in favor of terminating Father's parental rights.

Having determined that the evidence does not preponderate against this finding, we agree with the trial court that this factor weighs in favor of terminating Father's parental rights.

### 5.  Change of Caretakers and Physical Environment

The fifth factor to be considered is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5).

The trial court found that any change in caretakers would likely have a detrimental effect on Riley's emotional, psychological, and medical condition. In its final order, the court highlighted that Riley had "essentially been living in foster care all of his life[.]" For this reason, the trial court determined that "changing caregivers in this stage would greatly affect the child emotionally, psychologically, and physically."

It is undisputed that Riley had been in DCS custody for approximately three years, and that the conditions which led to his removal still existed at the time of trial. Moreover, testimony established that Riley refers to his foster parents as "Mom" and "Dad", while referring to Mother as "Ms. Letta." Significantly, evidence showed that Riley was well cared for in his current foster placement, with foster parents who provided all necessary medical and dental care. Furthermore, Ms. Spivey testified that Riley had been diagnosed with autism and that his current foster placement had taken steps to get Riley specialized care regarding his diagnosis. Testimony also established that Riley had bonded with both of his foster parents, as well as the other child living in the home, and that a change in

caregivers would have a negative effect on Riley's emotional, psychological, and mental health. Thus, we agree with the trial court's finding that this factor weighs in favor of terminating both parents' parental rights.

### 6. Abusive Behavior

The sixth factor to be considered is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(5).

The trial court found that both Mother and Father had "neglected Riley." Riley was adjudicated dependent and neglected by the court on two separate occasions based on substance abuse, inappropriate supervision, and lack of suitable housing. Though Father was incarcerated when DCS filed the second dependency and neglect petition pertaining to Mother and Grandmother, Father was not incarcerated when DCS filed the initial dependency and neglect petition, which contained allegations pertaining to both him and Mother. For this reason, we agree that Mother and Father neglected Riley and determine that the evidence does not preponderate against this finding. Thus, we agree with the trial court that this factor weighs in favor of termination as to both Mother and Father.

### 7. Physical Environment of Parent's Home

The seventh factor to be considered is:

> "[w]hether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner."

Tenn. Code Ann. § 36-1-113(i)(7).

Regarding this factor, the trial court explained that "the proof has shown that [Mother and Father] have and are currently abusing illegal substances and criminal activity . . . has gone on [in] the parents' home and this would render them unable to care for the child in a safe and suitable manner." Although not expressly stated in this section of the trial court's analysis, the court made numerous specific findings throughout its final order that the physical environment of the parents' home was not healthy or safe, that there was criminal activity in the home, as well as use of controlled substances or analogues.

Specifically, trial testimony established, and the trial court found, that Mother continued to live an unstable and "chaotic lifestyle[,]" that Mother continually failed to provide any proof of address of any residence or that Mother was never on lease at any residence. Ms. Spivey also established that Mother had continually been unable to provide

successful pill counts, failed to provide valid prescriptions, failed to complete the required non-self-reporting drug and alcohol assessment, and failed nearly every random drug screen. Significantly, Mother has been unable to show any efforts to maintain a sober lifestyle or establish stability.

As for Father, his incarceration for a violation of probation demonstrated continued criminal conduct and instability. Additionally, Father was unable to show that he had taken any steps toward addressing substance abuse.

Having determined that the evidence does not preponderate against the trial court's findings, we agree with the trial court that this factor weighs in favor of termination as to both Mother and Father.

### 8. Mental and Emotional State

The eighth factor to be considered is "[w]hether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8).

In its final order, the trial court concluded that it was in Riley's "best interest[] for termination to be granted as to [Mother], because her mental and emotional state would be detrimental to the [child] and would prevent her from effectively parenting the child." Although not expressly stated in this section of the trial court's analysis, the trial court made numerous specific findings throughout its final order that support this conclusion. Significantly, the trial court made specific findings throughout its final order regarding Mother's continuing substance abuse, even after rehabilitation and outpatient treatments. While we acknowledge Mother's testimony that she was taking care of her mental health, it is undisputed that Mother continued to struggle with addiction. In our view, addiction certainly affects Mother's mental and emotional status such that it would prevent her from providing safe and stable care for Riley. *See In re Austin W.*, No. M2020-01315-COA-R3-PT, 2021 WL 5105148, at *15 (Tenn. Ct. App. Nov. 3, 2021) (finding that a father's continuing drug addiction indicated that the father's emotional status would be detrimental to the child).

Having determined that the evidence does not preponderate against the trial court's findings, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

### 9. Child Support

The ninth factor to be considered is "[w]hether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9).

The trial court found that both Mother and Father failed to pay child support consistent with the child support guidelines. Testimony established, and the trial court found, that neither Mother nor Father had paid any child support throughout the entirety of Riley's custodial episode. While Mother contends that she provided Riley's foster family with diapers on occasion, the child support guidelines, as outlined under Tennessee Code Annotated § 36-1-113, mandate payment of monetary child support, due each month. *See* Tenn. Code Ann. § 36-1-113(c)(1). Thus, we agree with the trial court's finding that this factor weighs in favor of terminating both Mother and Father's parental rights.

Having examined each of the factors the trial court found relevant, and, as the statute requires, considering the factors from Riley's perspective, we agree with the trial court's final assessment that Riley's interests are best served by allowing him to remain in an environment where he has continued to thrive under the support of his current foster family. Thus, we affirm the trial court's finding that it is in the best interest of Riley that both Mother and Father's parental rights be terminated.

## IN CONCLUSION

Having affirmed the trial court's findings that grounds exist for terminating the parental rights of both parents, and that termination of their parental rights is in the best interest of Riley, we affirm the termination of the parental rights of Mother and Father. Costs of appeal are assessed against the appellants, Letta D. and Clint S.

_____
FRANK G. CLEMENT JR., P.J., M.S.